# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 08, 2025

Lyle W. Cayce
Clerk

No. 24-10306

Angelina Emergency Medicine Associates PA; Atascosa Emergency Medicine Associates PA; Athens Emergency Medicine Associates PA; Bluff Creek Emergency Medicine Associates, PA; Brewster Emergency Medicine Associates PA, *Et al.*,

*Plaintiffs—Appellants*,

*versus*

Blue Cross and Blue Shield of Alabama; USAble Mutual Insurance Company, *doing business as* Arkansas Blue Cross and Blue Shield; Anthem Blue Cross Life and Health, *doing business as* Anthem Blue Cross; Rocky Mountain Hospital and Medical Services, *doing business as* Anthem Blue Cross and Blue Shield of Colorado; Highmark BCBSD Incorporated; Blue Cross and Blue Shield of Georgia, Incorporated; Blue Cross Blue Shield Healthcare Plan of Georgia Incorporated; Wellmark, Incorporated, *doing business as* Blue Cross and Blue Shield of Iowa, *doing business as* Wellmark Blue Cross and Blue Shield; Blue Cross and Blue Shield of Kansas City; RightCHOICE Managed Care Incorporated; Healthy Alliance Life Insurance Company; HMO Missouri Incorporated; Blue Cross & Blue Shield of Mississippi, *A Mutual Insurance Company*; Blue Cross and Blue Shield of Nebraska, Incorporated; Blue Cross Blue Shield of North Dakota; Empire HealthChoice Assurance Incorporated; Empire HealthChoice HMO Incorporated; HealthNow New York Incorporated;

Community Insurance Company, *doing business as* Blue Cross and Blue Shield of Ohio; Highmark Incorporated; Wellmark of South Dakota Incorporated; Anthem Health Plans of Virginia, Incorporated; Premera Blue Cross; Blue Cross of Idaho Health Service, Incorporated, *doing business as* Blue Cross of Idaho,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-425

---

Before Smith, Higginson, and Douglas, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 40 I.O.P), the petition for rehearing is GRANTED. We withdraw our previous opinion, reported at 150 F.4th 393, and substitute the following:

Plaintiffs-Appellants (the Physician Groups) are fifty-six Texas emergency-medicine physician groups. The Physician Groups sued twenty-four Blue Cross Blue Shield-affiliated plans from outside of Texas (the Blue Plans), alleging that the Blue Plans underpaid the Physician Groups' claims for reimbursement. The Physician Groups alleged that they were owed payments based on patients' assignments of rights under the Blue Plans to the Physician Groups prior to treatment. The district court granted summary judgment on all claims for a variety of independent and overlapping reasons related to the different forms and language of the relevant plans. In so doing, the district court ignored the Physician Groups' arguments about ambiguities in contract language and applied the wrong legal standard in determining whether assignments to the Physician Groups were valid. We AFFIRM as

to the claims where no written assignment was produced. As to the remaining claims, because nearly all of the issues before us require further examination of the evidentiary record, we VACATE summary judgment in part and REMAND for further proceedings consistent with this opinion.

## I.

A physician group generally comprises one or more physicians who have formed a limited liability entity to operate their practice in a smaller or more independent manner. Physician groups are an alternative to salaried employment with a hospital or other healthcare organization.

The Physician Groups in this case contract with hospitals to staff emergency departments as facility-based providers. During the relevant period, patients covered under Blue Plans were treated by the Physician Groups at hospital emergency rooms in Texas. The Physician Groups were out-of-network with regard to the Blue Plans and did not have contracts with those Plans for billing and fee agreements. The Blue Plans paid the Physician Groups only part of what the Blue Plans were billed for the care.

Under the federal Emergency Medical Treatment and Active Labor Act, hospitals and emergency physicians must screen and treat patients suffering medical emergencies regardless of their ability to pay and without inquiring into the existence or nature of the patients' insurance coverage. 42 U.S.C. § 1395dd. Patients experiencing medical emergencies typically go to the nearest emergency room for treatment by whichever physician is available. As a result, many patients are treated in emergency rooms without knowing if that hospital is in-network, or is preferred by their insurance, and many physicians treat patients without knowing how or if their patients can pay for their services. Because of this information gap, it is common practice in emergency care settings for patients to assign their insurance benefits when they arrive at a hospital emergency room. The emergency provider

No. 24-10306

then pursues reimbursement from the insurer, and the patient is billed for any remaining cost of services.

The Physician Groups, as facility-based providers, use the hospital's registration process and staff to obtain assignments from the patients, typically using the hospital's standard form assigning benefits using language like "any practitioner providing care and treatment" to define the assignment to an unspecified, and at the time of assignment, often unknown, treating provider. The Physician Groups then, on behalf of the relevant member physician, submit a claim for reimbursement to Blue Cross Blue Shield of Texas (BCBSTX) as the in-state "host" plan. BCBSTX transmits the claim to the relevant out-of-state Blue Plan to "adjudicate the claim in accordance with the terms of the patient's health benefit plan . . . and transmit back to BCBSTX the claim determination for processing and payment." BCBSTX is then responsible for paying the Physician Group based on the other Blue Plan's determinations using funds provided by the out-of-state Blue Plan. The parties agree that this process was used for all the claims at issue in this appeal.

The Patient Protection and Affordable Care Act of 2010 (the ACA) governs payment for out-of-network emergency services in all the claims at issue in this case.[1] The ACA provides, in relevant part:

> A group health plan or health insurance issuer complies with the requirements of [the ACA] if it provides benefits with respect to an emergency service in an amount at least equal to the greatest of the three amounts specified[:] . . . (A) The amount negotiated with in-network providers for the emergency service furnished[;] . . . (B) The amount for the

---

[1] The claims in this case all predate the passage of the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020), which altered the "greatest-of-three" rule.

No. 24-10306

emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services[;] . . . [or] (C) The amount that would be paid under Medicare . . . .

45 C.F.R. § 147.138(b)(3)(i). The Physician Groups allege that BCBSTX, acting as the agent of the Blue Plans, refused to pay these greatest-of-three rates, but compliance with the greatest-of-three rule is not at issue in this appeal.

After the claims were partially paid, the Physician Groups pursued appeals under the Plans' appeals processes, which are laid out in a document called the BlueCard manual. The providers allege that they properly submitted appeals under the provider appeals process[2] by submitting the appeals to BCBSTX. The Physician Groups allege that BCBSTX did one of three things in response to each of the appeals. First, they occasionally replied with generic statements that did not explain the underpayment or point to provisions justifying the underpayment, stating simply that "[o]ur records indicate that the claim disposition was based on the member's benefit coverage." Second, they physically mailed back the appeal documents with no other response. Or third, they failed to respond at all. The Physician Groups also claim that BCBSTX sometimes directed them to the out-of-state Blue Plan, but those Plans then referred the Groups back to BCBSTX.

The Physician Groups filed suit in February 2018 against BCBSTX and amended the complaint in February 2019 to add the Blue Plans as defendants. The operative complaint alleges underpayment for 290,000 claims, but following a settlement with BCBSTX and other entities, over 75% of the claims were dismissed. The district court ordered the parties to

---

[2] In addition to the providers appeal process, the Blue Plans also have a member appeals process requiring appeals directly to the out-of-state Plans. *See infra* Part IV.

select representative bellwether claims and thereafter granted summary judgment as to all 182 bellwether claims. *Angelina Emergency Med. Assocs. P.A. v. Health Care Serv. Corp.*, No. 3:18-CV-0425-X, 2024 WL 102666 (N.D. Tex. Jan. 9, 2024).

The bellwether claims differed in a variety of ways.[3] Most importantly, the claims differed in the form of assignment, with five major sub-types:

1. A group of assignments assigned rights only to a hospital.

2. A group of assignments assigned rights to the hospital and facility-based physicians.

3. A group of assignments assigned rights to the hospital and its agents.

4. A group of assignments assigned rights to the hospital and "any third party designated by the" hospital.

5. For twenty-nine bellwether claims, the Physician Groups were unable to produce written evidence of an assignment and relied on a declaration from their Rule 30(b)(6) witness to establish assignment. *Id.* at *8.

The assignments also varied in what rights they assigned. Some assignments entitled facility-based physicians to pursue payment but did not explicitly provide a right to sue, while other assignments explicitly granted the right to appeal. Finally, some of the bellwether claims' underlying Blue Plans contained anti-assignment provisions either barring a member patient from assigning the right to benefits or allowing Blue Plans to pay a provider

---

[3] About 92% of the bellwether claims are ERISA claims, with the remaining 8% of claims falling under breach of contract.

No. 24-10306

directly while prohibiting the assignment of other benefits or legal rights. Though the language varies, a representative example reads:

> You may not assign your legal rights or rights to any payments under this Plan. However, the Plan may choose to remit payments directly to health care providers with respect to covered services, if authorized by you or your dependents, but only as a convenience to you. Health care providers are not, and shall not be construed as, either "participants" or "beneficiaries" under this Plan and have no rights to receive benefits from the Plan or to pursue legal causes of action on behalf of (or in place of) you or your dependents under any circumstances.

The district court found that the Physician Groups did not have standing because these assignments of benefits did not actually transfer any rights to the Physician Groups for multiple, overlapping reasons including: that some Groups did not provide evidence showing that they or their member physicians were "facility-based physicians;" that the Physician Groups and their member physicians were distinct legal entities; that some assignments did not delegate the right to pursue legal relief; that some assignments could not be produced; and that anti-assignment provisions in some of the Blue Plans barred assignment. *Angelina Emergency Med. Assocs. P.A.*, 2024 WL 102666, at *5-10. The district court also found that almost all of the bellwether claims could be dismissed on the alternative basis of failure to exhaust administrative remedies using the member appeals process rather than the provider appeals process, or due to a time bar. *Id.* at *10-15. For any bellwether claims dismissed "on more than one basis," each basis provided "alternate and independent grounds for dismissal." *Id.* at *7 n.60. The district court then severed the bellwether claims and entered final judgment for the Blue Plans on those claims. The Physician Groups appealed.

No. 24-10306

## II.

A grant of summary judgment is reviewed de novo. *Nickell v. Beau View of Biloxi, LLC*, 636 F.3d 752, 754 (5th Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence," which "shift[s] to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (per curiam). "The nonmovant cannot satisfy this burden merely by denying the allegations in the opponent's pleadings but can do so by tendering depositions, affidavits, and other competent evidence to buttress its claim." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992). "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## III.

The Employee Retirement Income Security Act of 1974 (ERISA) "is designed 'to protect . . . the interests of participants in employee benefit plans and their beneficiaries' by (1) 'requiring the disclosure and reporting to participants and beneficiaries'; (2) 'establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans'; and (3) 'providing for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619, 621 (5th Cir. 2014) (alteration in original) (quoting 29 U.S.C. § 1001(b)). "ERISA does not supply the provider with a basis for bringing its claim directly against the

No. 24-10306

appellants; instead, the provider's standing to bring this lawsuit must be derived from the beneficiary and it is subject to any restrictions contained in the plan." *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 250 (5th Cir. 2019). Federal courts lack jurisdiction to hear providers' ERISA claims where there is a deficient assignment or "a valid and enforceable anti-assignment clause[.]" *Id.*

For nearly all the bellwether claims, the district court concluded that the Physician Groups lacked standing based on one or more of four assignment-related issues: (1) that the Physician Groups were not named in the assignments, (2) that the assignments did not include a right to sue, (3) that the assignments themselves were not produced, and (4) that the underlying Blue Plans contained valid anti-assignment clauses. We address each of these bases in turn.

## A.

The district court held that the Physician Groups lacked standing because most of the assignments were made to "health care providers" rather than the physician groups themselves. *Angelina Emergency Med. Assocs. P.A.*, 2024 WL 102666, at *5.[4]

_____

[4] The district court also raised, sua sponte, that "the plaintiffs have not proffered any evidence that a member of their association was a 'facility-based physician' at the time a patient received their health care services," *Angelina Emergency Med. Assocs. P.A.*, 2024 WL 102666, at *5, without providing an opportunity for the Physician Groups to respond or enter such evidence into the record. However, the Blue Plans conceded in their summary judgment motion that it was an "undisputed material fact" that the claims at issue arose "[a]fter treatment by a physician employed by" the Physician Groups. The Physician Groups provided evidence that their doctors received payments on the claims at issue here—that is, evidence that implies they were the treating physician. The district court did not consider this evidence or this undisputed fact at summary judgment. Subject matter jurisdiction can be established by a "plausible set of facts" based on "the complaint supplemented by undisputed facts[.]" *Bank of La. v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019). The Physician Groups were not obligated to further "prove" undisputed material

No. 24-10306

The Physician Groups argue that, although the Groups and their members are distinct legal entities, the Physician Groups are the "providers of treating physicians" and thus "fall well within the scope of the general language of the assignments."[5] Both the district court and the Blue Plans relied on *Innova Hospital San Antonio LP v. Health Care Service Corp.*, No. 3:12-CV-01607, 2019 WL 13177034 (N.D. Tex. Oct. 2, 2019), where a district court found that an assignment of benefits to "Victory Parent Company LLC d/b/a/ 'Victory Medical Center'" could not provide "derivative standing on Plaintiff Victory Medical Southcross," *id.* at *3, because the two were "separate legal entities[,]" *id.* at *4. We need not resolve its correctness because the legal issue presented in *Innova Hospital*—whether assignment to a specific named entity on an assignment can be attributed to a different entity—is factually distinct from this case. Here, the question is *not* whether an assignment made to a specific, named doctor also applies to that doctor's physician group; plainly, the two are distinct legal entities. *See Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997) (holding that "a corporation is an entity separate from its shareholders" regardless of control and ownership). The question is whether an assignment naming a *class* of entities, that is, "health care providers" or facility-based providers, encompasses the Physician Groups.

--------

facts without any direction from the district court that it was disputing those facts sua sponte.

[5] The Physician Groups also argue that the Blue Plans cannot raise this distinction when they previously paid the claims at issue to the Physician Groups. But the pre-litigation payment of the claims cannot waive the jurisdictional requirements for a valid assignment that confers standing. *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996) ("The parties can never consent to federal subject matter jurisdiction, and lack of such jurisdiction is a defense which cannot be waived.").

No. 24-10306

As a threshold matter, the Blue Plans argue that we should not consider extrinsic evidence because the assignments are unambiguous. *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 573 (5th Cir. 1992), *overruled in part on other grounds by, Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012) (en banc) (per curiam) (holding that in the face of an *un*ambiguous assignment, "[t]he district court erred in . . . considering evidence of the [parties'] intent."). The Physician Groups contend that, at a minimum, the terms used in the assignments are ambiguous in scope. The assignments here are varied, including language such as:

- "I assign all benefits and all interest and rights to Wise Regional Health System and any practitioner providing care and treatment to me[.]"

- "I irrevocably assign to the Hospital and other Healthcare Providers/Practitioners who furnish services to me all benefits payable for services rendered to me[.]"

The Physician Groups argue that these assignments use "plain English for a lay audience," using descriptive "role and conduct" terms to "assign benefits to a readily identifiable class of people: the physicians providing care to those patients."

We can find no court case or contractual language defining the term "provider" in the context of these assignments. Merriam Webster defines "provider" as "one who provides[,]" and contains examples of usage that include companies as providers. *Provider*, Merriam-Webster Dictionary (11th ed. 2003). An article available on the National Institutes of Health's website from the publication *Federal Practitioner* criticizes the use of the term "provider" and explains that its origins are "in the sense of a contractor being paid for delivering any health-related products and

services" and reduces physicians to "dispensers of services rather than []
individuals." Jonathan R. Scarff, *What's in a Name? The Problematic Term
"Provider"*, 38 Fᴇᴅ. Pʀᴀᴄ. 446, 446 (2021). The term "provider" in
particular may contemplate both individual doctors and groups of doctors.
*See, e.g.*, *Dialysis Newco*, 938 F.3d at 249, 253 (using the term "healthcare
provider" to refer to the corporate dialysis institution rather than individual
doctors). The terms of the assignment are, therefore, ambiguous. And the
mere fact that the hospitals did not "include more precise form-language that
explicitly delegates rights to the management entities to which the facility-
based physicians belong" does not invalidate the assignment here.

Under Texas law, if a "contract is subject to two or more reasonable
interpretations after applying the pertinent rules of construction, the contract
is ambiguous, which creates a fact issue on the parties' intent." *King v. Baylor
Univ.*, 46 F.4th 344, 362 (5th Cir. 2022) (quoting *Columbia Gas Transmission
Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). The court
should, at a minimum, have allowed the parties to introduce evidence of the
intended scope of the assignments in the general practice of business. While
the finder of fact may still ultimately find that the Physician Groups were not
party to the assignments after this evidence is introduced, the court's grant
of summary judgment was improper at this stage.

**B.**

For thirty-three of the claims, the district court held that the
assignments provided only a right to administrative relief rather than the
right to seek legal relief. The Physician Groups counter that the plain text of
some of these thirty-three assignments goes beyond mere administrative
relief, providing several examples:

- "Each person signing . . . assigns all rights, title, interest and
  benefits . . . and authorizes direct payment to the hospital and

No. 24-10306

physicians . . . . I hereby appoint the hospital, affiliated physicians, and any agent acting on their behalf as my authorized representative to pursue any . . . legal remedies[.]"

- "I hereby assign and authorize payment . . . to the Facility, and to any facility-based physician, all insurance benefits . . . . I consent for the Facility to appeal on my behalf any denial for reimbursement[.]"

- "I assign and authorize payment . . . to the Facility, and to any Facility-based physician, all insurance benefits . . . . I consent for the Facility to work on my behalf with my insurance company/companies to get authorization or appeal any denial for reimbursement[.]"

The Blue Plans respond that the Physician Groups cannot rely on this evidence because they failed to cite it before the district court. Before the district court, the Groups advanced several theories related to the issue at hand: they made broad arguments about a right to sue under the assignments, made a specific argument about an assignment example the Blue Plans raised in their brief, and generalized the specific argument to a "subset of the Bellwether Claims." The argument is therefore not waived. *See Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 519 n.5 (5th Cir. 2010) (rejecting the argument that an interpretation of a contract was waived when the district court ruled on the issue, because "[w]e are not bound to overlook the relevant provisions of the policy only because the parties failed to point to them.").

The Blue Plans also argue that these assignments fail because they "do not specifically mention legal rights." This argument is equally unavailing when the assignments assign "all rights" and "all insurance benefits" *in addition to* authorizing direct payment, and mention assigning the right to appeal denials or pursue legal remedies. In *Dialysis Newco*, we explained there

was a "degree of distinction between a direct-payment authorization and a full-on assignment of benefits." 938 F.3d at 254. But there is no basis in the law for requiring that an assignment specifically state it provides a right to sue when it assigns "all rights." The district court erred in finding that claims assigning rights or insurance benefits did not assign a right to sue.

## C.

The Physician Groups concede that they do not have written assignments for twenty-nine of the bellwether claims. To replace the missing assignments, the Physician Groups instead proffered a declaration from their Rule 30(b)(6) witness, Paul Jordan, the Director of Revenue Assurance with SCP Health. The Physician Groups argued to the district court that an assignment need not be in writing to be effective, citing in support *Encompass Office Solutions, Inc. v. Connecticut General Life Insurance Co.*, No. 3:11-CV-02487, 2017 WL 3268034, at *10 (N.D. Tex. July 31, 2017). The district court followed *Encompass* and held that "witness deposition testimony [i]s, as an evidentiary matter, enough to survive an opposing motion for summary judgment as to whether there was a valid assignment." *Angelina Emergency Med. Assocs. P.A.*, 2024 WL 102666, at *8. But the district court then rejected the Jordan declaration as insufficient under Rule 56 of the Federal Rules of Civil Procedure.

Under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). As the district court correctly pointed out, Jordan's declaration states only that he is employed by SCP Health. He does not provide any basis for having "personal knowledge as to the routines at" the "nearly half-a-hundred physicians associations" or hospitals at issue in the underlying claims.

*Angelina Emergency Med. Assocs. P.A.*, 2024 WL 102666, at *8. Even if, as the Physician Groups explain, "SCP Health is the umbrella name for the companies that manage all of the plaintiffs," this cannot explain how a Director of Revenue Assurance at a managerial company could speak to the paperwork practices of hospitals contracting with individual groups.

We credit the district court's factual determination that, at best, "Jordan's declaration . . . creates a fact dispute as to the existence of assignments where he works" but not at the hospitals themselves. *Id.* Because the Physician Groups admit that they do not create, administer, or collect the assignment forms, the district court's dismissal of the claims without a written assignment was reasonable.

## D.

In addition to finding issues with specific assignments, the district court held that the underlying health benefit plans for nearly all the claims contained valid anti-assignment clauses prohibiting the assignment of the claims to the Physician Groups. The Physician Groups argue that the Blue Plans are estopped from asserting any anti-assignment clauses because the Blue Plans partially paid the claims and refused to provide the Groups with copies of the health benefit plans that contained the anti-assignment clauses. The Blue Plans claim that the Physician Groups are seeking to assert ERISA estoppel against them. The Physician Groups counter that they are not seeking ERISA estoppel, but instead a separate theory of equitable estoppel laid out in *Hermann*, which predates ERISA estoppel. The Physician Groups have disavowed any reliance on ERISA estoppel. Nevertheless, the district court conflated the estoppel at issue in *Hermann* with ERISA estoppel, and thus improperly applied the ERISA estoppel test to the claims at issue here.

We have recognized ERISA estoppel as a basis for legal relief that lies when a plaintiff shows "(1) a material misrepresentation; (2) reasonable and

No. 24-10306

detrimental reliance upon the representation; and (3) extraordinary circumstances." *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444-45 (5th Cir. 2005).[6] In so doing, we explained that "ERISA disfavors generally arguments based on promissory estoppel or on alleged modifications of plan documents that are not made via the plan's internal amendment process." *Id.* at 447 (quoting *Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1517 (5th Cir. 1994)).

In a separate line of cases predating our adoption of ERISA estoppel, we examined anti-assignment provisions in ERISA cases. First, in *Hermann*, Hermann Hospital sued the insurance company MEBA as an assignee of a patient who was covered by MEBA. *Hermann*, 959 F.2d at 571. Hermann "maintained continuous communication with MEBA, attempting to obtain periodic payments on the claim, but MEBA kept postponing payment, asserting that it was 'investigating' the claim[.]" *Id.* at 574. After Hermann sued, MEBA "for the first time asserted the anti-assignment clause as a basis for its refusal to pay." *Id.* We held that, because "MEBA failed to assert the anti-assignment clause until more than three years after Hermann first requested payment, it is estopped to do so now." *Id.* In particular, we found that "Hermann, which was not privy to the Plan, had no opportunity to review that documentation" containing the anti-assignment clause, and "[i]t was MEBA's responsibility to notify Hermann of that clause if it intended to rely on it to avoid any attempted assignments." *Id.* Although MEBA argued that it was "treat[ing] the assignment document as nothing more than an authorization by [the patient] Mrs. Nicholas for MEBA to pay benefits

---

[6] Prior to 2005, "[t]his circuit ha[d] yet to explicitly adopt ERISA-estoppel as a cognizable legal theory . . . [but] ha[d] considered that the theory could be cognizable given the right set of facts." *Mello*, 431 F.3d at 444 (first citing *McCall v. Burlington N./Santa Fe Co.*, 237 F.3d 506, 513 (5th Cir. 2000); and then citing *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 290 (5th Cir. 1997)).

No. 24-10306

directly to Hermann" and so did not think the anti-assignment provision was implicated until the suit, we disagreed:

> It had to be clear to MEBA that Hermann, in admitting and providing services to Mrs. Nicholas, was relying on that assignment as its entitlement to recover payment for those Plan benefits that Hermann furnished to Mrs. Nicholas. Thus, it was unreasonable for MEBA to lie behind the log for three years without once asserting the anti-assignment clause, of which Hermann had no knowledge, while duplicitously dragging out the ongoing negotiations to liquidate the claim.

*Id.*

Later, in a dispute between a provider and an insurer involving an assignment of rights to the provider on the eve of litigation, we validated an anti-assignment clause in an ERISA plan based on the distinction between a "direct-payment authorization and a full-on assignment of benefits." *Dialysis Newco*, 938 F.3d at 254. We factually differentiated *Dialysis Newco* from *Hermann* on the basis that, in *Hermann*, "the benefits plan postponed payments on Hermann's claims for three years while it investigated the claim. Accordingly, the court held that the plan was estopped from asserting the anti-assignment clause." *Id.* at 255 (citing *Hermann*, 959 F.2d at 573-74). By contrast, in *Dialysis Newco*, the patient assigned the right to sue to the provider four days before the provider brought suit and months after the initial treatment, even though "the plan's plain language, as it would be understood by an average plan participant, unambiguously prohibits the assignment of a beneficiary's legal rights." *Id.* at 255-56. Though estoppel was not at issue in *Dialysis Newco* because the assignment occurred mere days before litigation, we recognized that *Hermann*'s estoppel was based on three years of "postponed payments," without discussing ERISA estoppel principles. *Id.* Despite the opinion in *Mello* comprehensively discussing the entire line of ERISA-estoppel cases in this circuit, it did not discuss or even

No. 24-10306

cite *Hermann*, while neither *Hermann* nor *Dialysis Newco* discussed ERISA estoppel.

There is no basis in the case law to suggest that ERISA estoppel and estoppel under *Hermann* are the same legal theories. *See Dwyer v. United Healthcare Ins. Co.*, 115 F.4th 640, 652-53 (5th Cir. 2024) (holding that "[u]nder ERISA, the doctrines of waiver and estoppel *can* apply" to prevent the plan administrator from invoking defenses under the terms of the policy without applying the specific test of ERISA estoppel). Instead, *Hermann* and ERISA estoppel lay out two distinct types of estoppel. *Hermann*, the earlier-in-time decision, based its estoppel ruling on the equitable principle that a plan could not wait for years to assert an anti-assignment clause that the third party bearing the assignment had no way of learning about. *Mello* and later ERISA estoppel cases base their rulings on promissory estoppel principles with the added requirement of extraordinary circumstances that would prevent the written plan from controlling. At issue here are plaintiffs that were not parties to the written plans and did not have copies of the plans and were thus not bound by the promissory estoppel principles at issue in *Mello*. The district court erred in assuming the tests for ERISA estoppel under *Mello* and general estoppel in ERISA cases were legally identical and then applying the more stringent, inapplicable ERISA estoppel test.

The critical question is whether the facts of the case and the anti-assignment provisions more closely track *Hermann*, estopping the insurers from enforcing the clause, or *Dialysis Newco*, in which estoppel was appropriately not raised because of the timeline of the assignment. Without further evidence about the exact interactions between the parties, *Hermann* seems more applicable. The patients assigned all rights before treatment of emergency conditions, not akin to the second, considered assignment in *Dialysis Newco* where the patient assigned their rights on the eve of litigation. The Physician Groups, who had received partial responsive reimbursement,

No. 24-10306

then attempted to receive full payment from the Blue Plans using the publicly available manual for provider claims and appeals, and even requested the underlying plan documents, which the Blue Plans did not provide.

The Blue Plans do not address the Physician Groups' allegations, and instead argue that "[i]t is irrelevant whether BCBSTX, a third-party with no responsibility for appeals under any of the healthcare plans at issue, failed to comply with ERISA's requirements." But this is a logical fallacy. As discussed further in Part IV, the Blue Plans essentially argue that the Physician Groups used the incorrect appeals process and therefore were not entitled to the plan documents, *which contained the correct appeals process*. The record does not contain any alternative basis by which the Physician Groups could have learned of the anti-assignment clauses contained within the plans, especially because the Blue Plans did engage in partial payment and discussion with the Groups—just as in *Hermann*. And the Blue Plans do not identify any alternative manner that the Physician Groups should have used to learn of the text of the plans.

The district court committed legal error in applying the incorrect test to determine whether the Blue Plans should be estopped from enforcing the anti-assignment clauses. It is possible that, for some or all claims, the Physician Groups possessed the underlying plans and therefore should have known about the anti-assignment clauses. That is a fact issue that the district court must determine as to each claim.

## IV.

The district court held that the Physician Groups failed to exhaust administrative remedies under the applicable plans before filing suit—either through ERISA's requirements for the ERISA claims, or under contract law for the non-ERISA claims—forming an independent basis for dismissal for all but a few of the claims.

No. 24-10306

ERISA regulations require benefit plans to establish and maintain reasonable claims procedures, including ones governing appeals of adverse benefit determinations. 29 C.F.R. § 2560.503-1(b). "A claimant who is denied benefits under an ERISA plan must exhaust all administrative remedies afforded by the plan before instituting litigation for recovery of benefits." *Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 256 (5th Cir. 2005) (per curiam); *see also Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295, 1300 (5th Cir. 1985) (explaining the purposes of the exhaustion requirement). There are two administrative procedures at issue here. The first is the provider appeals process. Under the BlueCard manual, which was available to the Physician Groups as a publicly available document, the provider was required to submit appeals of unpaid or underpaid claims to the host plan, here BCBSTX. Toni Surratt, the Blue Plans' Rule 30(b)(6) witness, testified that appeals submitted by the provider to the host plan were conveyed to the patient's home plan. The second process is the member appeals process for Blue Plan members to appeal claims decisions. Under the specific terms laid out in the members' plans, members were required to appeal determinations directly to their home plan and could not appeal to the host plan, BCBSTX. It is undisputed that the Physician Groups exhausted the administrative appeals process for providers and failed to exhaust the appeals process for members. The testimony of the Blue Plans' Rule 30(b)(6) witness shows that, specifically, the BlueCard manual rules were followed:

> Q. You would agree, though, that based on the appeals we just reviewed, providers, the plaintiffs did submit, at least with respect to some of the Bellwethers we looked at, disputes over underpayment amounts to [BCBSTX]; right?
>
> A. I would agree they sent them to Texas.
>
> Q. And under the Blue Card rules, they were required to submit them to Texas, right?

No. 24-10306

A. That is correct.

Because the Physician Groups were attempting to act on a member assignment, they were required to "take[] all the rights of the assignor, no greater and no less." *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (quoting *FDIC v. McFarland*, 243 F.3d 876, 887 n.42 (5th Cir. 2001)). As we have previously explained, "claimants seeking benefits from an ERISA plan" are required to "exhaust available administrative remedies under the plan" before proceeding to court. *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000). Taking *Quality Infusion Care* and *Bourgeois* together, in order to claim ERISA benefits as assignees, the Physician Groups must exhaust under the member remedies unless an exception to the exhaustion requirement applies.

ERISA exhaustion is a court-imposed requirement intended to "minimiz[e] the number of frivolous ERISA suits, promot[e] the consistent treatment of benefit claims, provid[e] a nonadversarial dispute resolution process, and decreas[e] the time and cost of claims settlement[,] . . . [as well as] provide a clear record of administrative action if litigation should ensue, and to assure that judicial review is made under the arbitrary and capricious standard, not de novo." *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 231 (5th Cir. 1997). However, "a court should not relinquish its jurisdiction because of a failure to exhaust administrative remedies when there was a valid reason for such failure[,]" including the futility or inadequacy of administrative remedies. *Bourgeois*, 215 F.3d at 481-82 (first citing *Hall*, 105 F.3d at 232; then citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (holding that a failure to exhaust EEOC administrative procedures is not a jurisdictional bar to a federal lawsuit); and then citing *Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Emps. Pension Fund*, 847 F.2d 113, 121 (3d Cir. 1988) (allowing claim under Multiemployer Pension Plan Amendments Act

No. 24-10306

to proceed based on "equitable principles," despite a lack of prior arbitration)).

The Physician Groups raise multiple equitable bases for exemption from ERISA's exhaustion requirements. First, the record reflects multiple attempts by the Physician Groups to request from BCBSTX "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review." The Physician Groups were entitled to that information as part of the provider appeals process under ERISA regulations, 29 C.F.R. § 2560.503-1(j),[7] but contend they never received this information in response to their appeals. The Physician Groups also allege that BCBSTX sometimes suggested that the appeals be sent to the out-of-state Blue Plans, but that when the Physician Groups sent their appeals out of state, they were referred back to BCBSTX.

The repeated testimony of the Blue Plans' Rule 30(b)(6) witness corroborates that appealing to BCBSTX was the pathway available to the Physician Groups as providers:

> Q: . . . Sticking with the same example of Texas being the host plan, you have [a Blue Plan] member living and working in Texas, receiving healthcare in Texas, where does that Texas

---

[7] When a plan "fail[s] . . . [to] follow claims procedures consistent with the requirements" under § 2560.503-1, the "claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies" under ERISA's civil-litigation provision. 29 C.F.R. § 2560.503-1(l)(1). Thus, even if we did not hold that the Physician Groups were exempted from the exhaustion requirement, ERISA regulations would provide a separate basis for finding that the Groups had exhausted their appeals.

No. 24-10306

provider submit an appeal . . . if they want to challenge the payment they received?

A: They would send that to Texas.

Q: And . . . is that a requirement, that they send it to Texas?

A: Yes.

Q: Where is that requirement derived?

A: As part of the licensure agreement that the plans hold with the Blue Cross Blue Shield Association, they're required to educate all providers within their defined service area, and part of that education says to [the providers,] you're required to communicate . . . only with your host plan.

At bottom, the Physician Groups argue that they made all possible efforts to obtain the underlying plans and understand alternative appeals processes, while still following the publicly available appeals process, but were not given copies of the plan. We have previously held that a claimant's efforts, or lack thereof, to obtain the plan can be a key fact in finding whether the claimant has cleared the hurdle of ERISA exhaustion. *See Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1278-79 (5th Cir. 1990). For example, we denied an exception to ERISA's exhaustion requirement where "there [was] no mention in the record that [the claimant] ever requested plan information from Appellees." *Id.* at 1279. We added that our ruling was "not to say . . . that [the claimant] would have no judicial remedy if Appellees' failure to provide him with pension plan information prejudiced him," citing an out-of-circuit decision that held a "plan administrator's refusal to provide plan documents denied [the] claimant meaningful access to administrative remedies and excused claimant from [the] exhaustion requirement." *Id.* (citing *Curry v. Cont. Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846

No. 24-10306

(11th Cir. 1990), *abrogated in part on other grounds by, Murphy v. Reliance Standard Life Ins. Co.*, 247 F.3d 1313 (11th Cir. 2001)).

In *Bourgeois*, we again reasoned that an exception did not apply because the claimant "admit[ed] he had a copy of the [relevant] Pension Plan and had read it" and, citing *Meza*, the claimant had "a duty to seek the necessary information." 215 F.3d at 480 (citing *Meza*, 908 F.2d at 1279). And still, in *Bourgeois*, we "estop[ped] the defendants from asserting certain defenses" because "the company presented no evidence" that it provided the claimant with documents showing the proper avenues of exhaustion, and because the defendants "engaged [the claimant] in negotiations regarding his benefits without ever referring him to the proper channels[.]" *Id.* at 482. The Physician Groups have shown that they requested the underlying plans—as required under *Meza* and *Bourgeois*—and that BCBSTX and the Blue Plans did not "refer[] [them] to the proper channels" or direct them toward the actual appeals process. *Id.* The Blue Plans proffer a circular argument. They argue that the Physician Groups should have used the member appeals process contained in the underlying plan, even though the Physician Groups did not have the underlying plan and requested a copy from the Blue Plans using the provider appeals process. But the Blue Plans failed to provide a copy of the underlying plan through the provider appeals process because the Physician Groups should have used the member appeals process contained in the underlying plan.

Without addressing this circular logic, the district court held that the Physician Groups "have not produced evidence that they've exhausted their administrative remedies," and that "filing appeals to the wrong body[] do[es] not satisfy the exhaustion requirement." *Angelina Emergency Med. Assocs. P.A.*, 2024 WL 102666, at *11. We will not credit the Blue Plans' flawed logic. At a minimum, there is a factual dispute as to whether the Physician Groups could have discovered the member appeals process without action by

No. 24-10306

BCBSTX, and whether it would have been reasonable to require the Physician Groups to undertake that separate process when they were already being partially paid by BCBSTX.[8]

* * *

We AFFIRM summary judgment as to the claims with no written assignment in evidence and VACATE summary judgment as to the remaining claims. We REMAND the remaining claims to the district court for evidentiary determinations as to the validity of the underlying assignments and exceptions to exhaustion.

---

[8] The district court dismissed thirteen of the non-ERISA claims for failure to exhaust administrative remedies by the contractual language of these plans. This dismissal was improper for the same reasons discussed above—there are factual disputes as to whether the Physician Groups knew the contractual language of the plans, let alone the exhaustion procedures contained therein.